**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

_____
)
INTERSTATE FIRE AND CASUALTY )
COMPANY, )
)
Plaintiff, )
)
v. ) Civil Action No. 10-1193 (ABJ)
)
WASHINGTON HOSPITAL CENTER )
CORPORATION, d/b/a WASHINGTON )
HOSPITAL CENTER, GREENSPRING )
FINANCIAL INSURANCE LIMITED, )
and MEDSTAR HEALTH INC., )
)
Defendants. )
_____)

**<u>MEMORANDUM OPINION</u>**

Plaintiff Interstate Fire and Casualty Company ("Interstate") brings this action against

defendants Washington Hospital Center ("WHC"), Greenspring Financial Insurance Limited

("GFIL"), and MedStar Health Inc. ("MedStar") seeking reallocation of a settlement paid by

plaintiff for the alleged medical malpractice of Nurse Chichio Hand.  Plaintiff argues it is entitled

to reallocation of the settlement because (1) Nurse Hand is an employee of WHC within the

meaning of WHC's insurance policy with GFIL, and (2) the "other insurance" clauses in the

GFIL and Interstate insurance policies provide that the GFIL supplies primary coverage to Nurse

Hand and Interstate supplies excess coverage.  The parties filed cross-motions for summary

judgment regarding reallocation of the settlement.  Defendants' motion also requests that WHC

and MedStar be found not liable because plaintiff's arguments regarding liability do not apply to

them.  As to the liability of defendant GFIL, the Court will grant plaintiff's motion for summary

judgment [Dkt. # 32], and deny defendants' cross-motion [Dkt. # 33] because it finds that Nurse

Hand was an "employee" within the meaning of the GFIL insurance policy.  However, the Court will grant defendants' motion for summary judgment [Dkt. # 33] as it pertains to WHC and MedStar.

## BACKGROUND

### I.     The Underlying Litigation and Settlement[1]

The reallocation dispute in this case is the product of a settlement agreement that arose out of a medical malpractice suit brought by patient Radianne Banks against WHC and two WHC doctors ("the underlying litigation").  Compl. ¶ 10.  In that suit, WHC filed a Third-Party Complaint against Progressive Nursing Staffers of Virginia, Inc. ("Progressive") and Ms. Chichio Hand, the temporary nurse that was responsible for Ms. Banks's post-op care.  *Id.* ¶ 11. Nurse Hand was hired to work at WHC through Progressive.  *Id.*  The Third-Party Complaint alleged both contribution and indemnification.  *Id.*

The underlying litigation eventually settled and Ms. Banks received a total of $4,105,000. Pl.'s Statement of Material Facts ("Pl.'s SMF") ¶ 56 [Dkt. # 32-23].  Consequently, Interstate – Progressive's insurer – paid $3,055,000 on behalf of Nurse Hand.  Compl. ¶ 15.  Interstate also paid $148,062 in attorneys' fees and "$5,186.75 in costs/expenses in defending the Underlying Action."  Pl.'s SMF ¶ 59.

### II.     Reallocation of the Settlement

In the instant case, Interstate brings this suit against WHC, WHC's parent company MedStar, and WHC's insurer Greenspring Financial Insurance Limited ("GFIL"), alleging breach of contract, contribution, and subrogation.  Compl. ¶¶ 31–40.  Interstate also seeks a

---

1     The following facts regarding the underlying litigation, taken from plaintiff's complaint, are undisputed by defendants.

declaration that Nurse Hand is an insured of GFIL and that GFIL is required to reimburse Interstate for the $3,055,000 that Interstate paid on behalf of Nurse Hand in the underlying litigation. *Id.* ¶¶ 41–45. Defendants collectively deny Interstate's allegations. Answer ¶¶ 31–45.

Interstate subsequently filed a Motion for Partial Summary Judgment [Dkt. #32] and defendants filed a Cross-Motion for Summary Judgment [Dkt. #33]. The parties disagree on two issues. First, they disagree as to whether Nurse Hand was an employee within the meaning of WHC's insurance policy with GFIL and, therefore, whether there is any theory by which GFIL is responsible for Nurse Hand's portion of the settlement. And second, if Nurse Hand is an employee of WHC for purposes of GFIL's insurance policy, the parties disagree as to whether the responsibility for covering Nurse Hand's expenses related to the underlying litigation should be determined by the "other insurance" provisions in the GFIL and Interstate insurance policies (which would require GFIL to reimburse Interstate for all expenses paid on behalf of Nurse Hand), or whether the indemnification agreement in the Temporary Staffing Agreement could preclude a finding of GFIL's liability. The following undisputed facts are necessary for resolution of both issues.

**A. The Relationship between Progressive, WHC, and Nurse Hand**

In February 2002, Progressive and WHC entered into a Temporary Staffing Agreement ("Agreement"), which provided the terms by which Progressive would provide temporary nurses to WHC. Pl.'s SMF ¶¶ 3, 5; Defs.' Statement of Undisputed Material Facts ("Defs.' SMF") ¶ 4 [Dkt. # 33-2]. Under the Agreement, Progressive nurses could work on a per diem basis ("one shift up to potentially several weeks of work") or as local travel staffing ("2 to 13 or more weeks in duration[] with a minimum assignment of 24 hours per week"). Defs.' SMF ¶ 7; *see also* Pl.'s

SMF ¶ 6.  At the time of Nurse Hand's alleged malpractice, she was working at WHC on a per diem basis.  Pl.'s SMF ¶¶ 6, 9; Defs.' SMF ¶¶ 30–31.

The Agreement also provided that Progressive nurses were to remain employees of Progressive;[2] that Progressive, not WHC, would pay the nurses their wages;[3] and that Progressive was to designate a Progressive "employee to act as a 'Staffing Specialist' who [would] remain available as a liaison to [the hospital] for coordinating and scheduling services to be provided."  Ex. 2 to Pl.'s Mot. for Partial Summ. J. ("Pl.'s MSJ") [Dkt. # 32-2] at 2, 7–8; *accord* Defs.' SMF ¶¶ 8–9, 13.  At the same time, however, the Agreement provided that WHC controlled the day-to-day tasks of a Progressive nurse during that nurse's shift.  Ex. 2 to Pl.'s MSJ at 4–5 ("[WHC] will . . . maintain responsibility for clinical supervision and direction of [Progressive] Registered Nurses with regard to day-to-day staffing and nursing objectives. . . . [WHC] may immediately terminate the services of a Registered Nurse who fails to perform within the reasonable expectations of [WHC] or fails to follow [WHC] policies for patient care."); *see also* Pl.'s SMF ¶¶ 11–13.  WHC's representative acknowledged that, despite the

---

2       Plaintiff argues that the provision in the Agreement that states that Progressive nurses remain Progressive employees was included for the sole purpose of preventing WHC from soliciting nurses without fairly compensating Progressive.  Pl.'s SMF ¶ 48.  Defendants, on the other hand, argue that inclusion of that statement in the Agreement shows the intent of Progressive and WHC that Progressive nurses would not be employees of WHC.  *See* Defs.' SMF ¶ 19.  Whether the Agreement indicates intent on the part of Progressive and WHC that Progressive nurses remain Progressive employees, however, is irrelevant to the question before the Court for two reasons.  First, the Court is tasked with interpreting the meaning of the word "employee" in an insurance contract between WHC and GFIL.  As a result, the Agreement is parol evidence that the Court may not consider.  Second, even if there was an intention that Progressive nurses remain employees of Progressive, there is nothing in D.C. law that would prohibit the finding that Nurse Hand was an employee of both Progressive and WHC at the time of her alleged negligence.  Consequently, the Court need not address the issue.

3       Progressive was also responsible for "withholding federal and state income taxes, payment of Federal Social Security and Medicare taxes, and payment of applicable unemployment insurance and maintenance of worker's compensation insurance as required by law."  Ex. 2 to Pl.'s MSJ at 7; *accord* Defs.' SMF ¶ 13.

presence of Progressive staff, WHC retained ultimate control over Progressive nurses' day-to-day tasks as well as the ultimate authority to say that they would no longer allow a certain nurse to work at WHC.  Eckert Dep., Ex. B to Defs.' Mot. for Summ. J. ("Eckert Dep.") 51:11–52:9 [Dkt. # 33-4] ("The Hospital Center always retained the right in order to determine and ascertain what the assignment of the individual nurse would be . . . .  [They also had the right to] say this particular nurse is not meeting our standard . . . . [and w]e will no longer choose to have them work at our hospital . . . .").[4]

Finally, the Agreement included an indemnification clause, under which Progressive was required "to indemnify WHC for claims arising from the negligence of Progressive or its registered nurse employees who were provided to WHC."  Defs.' SMF ¶ 15; *accord* Ex. 2 to Pl.'s MSJ at 8.  The indemnification clause served as the basis for the Third-Party Complaint filed by WHC in the underlying litigation.  *See* Pl.'s SMF ¶ 52; Defs.' SMF ¶¶ 15, 47.

### B.  Insurance Policies

There are two insurance policies that are relevant in the instant case.  The first is the policy in which GFIL agreed to "indemnify the ***Insured*** for all sums that the ***Insured*** shall become legally obligated to pay as ***Damages*** as a result of ***Injury*** to any person arising out of a covered ***Medical Incident*** occurring during the policy period," Defs.' SMF ¶ 39; *accord* Pl.'s SMF ¶ 62, including repayment for legal expenses incurred by the insured where insured is a defendant in a suit, Defs.' SMF ¶ 40.  Under the policy, an insured is "any employee other than a

---

4       There is some dispute between the parties as to whether the Progressive staff member on site at WHC conducted clinical supervision of the Progressive nurses.  *See* Pl.'s SMF ¶¶ 19–21; Defs.' SMF ¶ 12.  There is also dispute as to whether the Progressive staff member was present on the day of Nurse Hand's alleged negligence.  *See* Pl.'s SMF ¶ 20; Eckert Dep. 49:12–50:22.  These factual disputes, however, do not affect the Court's analysis for the reasons described below.  Consequently, the Court does not find that they create a genuine issue of material fact that would preclude summary judgment.

Physician, Podiatrist, Dentist, medical or dental intern, or resident of [WHC] while acting within the scope of his or her duties as such for [WHC]."  Defs.' SMF ¶ 39; *accord* Pl.'s SMF ¶ 64. The policy defines employees as "all past, present, or future full-time or part-time ***Employees*** of [WHC]."  Defs.' SMF ¶ 39; *accord* Pl.'s SMF ¶ 67.

In addition to the regular terms of coverage, the GFIL policy includes an "other insurance" provision.  Defs.' SMF ¶ 40.  This provision provides in pertinent part that:

> The insurance afforded by this policy is primary insurance, except when stated to apply in excess of or contingent upon the absence of other insurance.  When this insurance is primary and the ***Insured*** has other insurance that it stated to be applicable to the loss on an excess or contingent basis, the amount of the Company's liability under this policy shall not be reduced by the existence of such other insurance. . . .

> However, with respect to coverage afforded by this policy as it may apply to **<u>Employees</u>**, this insurance is designated primary and the foregoing provisions contained in this section shall not apply.

*Id.* (final emphasis added).

The Interstate insurance policy is the second policy that is relevant to this case.  Although the Interstate policy provides similar coverage to that of GFIL, *see* Pl.'s SMF ¶¶ 72–73; *see also* Defs.' SMF ¶ 45, it differs from GFIL's policy with respect to the "other insurance" provision. Whereas GFIL's "other insurance" provision states that it remains a primary insurer for employees regardless of other applicable insurance, plaintiff's "other insurance" provision provides in pertinent part:

> If there is other valid insurance (whether primary, excess, contingent or self-insurance) which may apply against a loss or claim covered by this policy, the insurance provided hereunder shall be deemed excess insurance over and above the applicable limit of all other insurance or self-insurance.

> When this insurance is excess, the Company shall have no duty under this policy to defend any **Claim** or **Suit** that any other insurer or self-insurer has a duty to defend.

Pl.'s SMF ¶ 74 (emphasis in original omitted); *accord* Defs.' SMF ¶ 45.  Consequently, plaintiff

argues, and defendant does not dispute, that, should the Court find that Nurse Hand is covered by

GFIL's policy and that the "other insurance" provisions control the disposition of this case, GFIL

would be liable to reimburse plaintiff for the money paid on behalf of Nurse Hand.

### C.  Settlement Agreement

In addition to settling Ms. Banks's legal claims, the settlement agreement executed in the

underlying litigation included an agreement by which WHC released Progressive "from any and

all claims" that "WHC may now have or may hereafter have against . . . Progressive by reason of

any matter, cause or thing arising out of, or in any manner connected with, the Litigation . . . .

including but not limited to the Temporary Staffing Agreement."  Ex. 12 to Pl.'s MSJ at 3.  At

the same time, a specific provision was included, which expressly states that:   "Nothing

contained in this Agreement [would] be construed as a waiver of [Interstate's] rights under its

policies to seek reallocation of the settlement. . . .   [Interstate] does not waive and expressly

reserves the right to rely on the 'other insurance' clauses incorporated into its policies to seek

reallocation of the settlement. . . ."  *Id.* at 4; *accord* Pl.'s SMF ¶ 58; Defs.' SMF ¶ 51.

Interstate has brought the instant case based on the express language in the settlement

agreement, which it claims reserved Interstate's right to seek reallocation of the settlement.  The

parties' cross-motions for summary judgment are now pending before the Court.

### STANDARD OF REVIEW

Summary judgment is appropriate "if the movant shows that there is no genuine dispute

as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P.

56(a).  The party seeking summary judgment bears the "initial responsibility of informing the

district court of the basis for its motion, and identifying those portions of the pleadings,

depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (internal quotation marks omitted). To defeat summary judgment, the non-moving party must "designate specific facts showing there is a genuine issue for trial." *Id*. at 324 (internal quotation marks omitted). The existence of a factual dispute is insufficient to preclude summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute is "genuine" only if a reasonable fact-finder could find for the non-moving party; a fact is only "material" if it is capable of affecting the outcome of the litigation. *Id*; *see also Laningham v. U.S. Navy*, 813 F.2d 1236, 1241 (D.C. Cir. 1987).

"The rule governing cross-motions for summary judgment . . . is that neither party waives the right to a full trial on the merits by filing its own motion; each side concedes that no material facts are at issue only for the purposes of its own motion." *Sherwood v. Washington Post*, 871 F.2d 1144, 1148 n.4 (D.C. Cir. 1989), quoting *McKenzie v. Sawyer*, 684 F.2d 62, 68 n.3 (D.C. Cir. 1982). In assessing each party's motion, "[a]ll underlying facts and inferences are analyzed in the light most favorable to the non-moving party." *N.S. ex rel. Stein v. District of Columbia*, 709 F. Supp. 2d 57, 65 (D.D.C. 2010), citing *Anderson*, 477 U.S. at 247.

## ANALYSIS

### I.     GFIL Must Reimburse Plaintiff For The Expenses Incurred On Behalf Of Nurse Hand In The Underlying Litigation.

When determining whether GFIL must reimburse Interstate for the amount Interstate paid on behalf of Nurse Hand as a result of the underlying litigation, the Court must address two issues. First, the Court must determine whether Nurse Hand is considered an "employee" of WHC such that she is covered by the GFIL insurance policy. If the answer is no, the Court's inquiry ends and GFIL is not liable. If, however, the Court finds that Nurse Hand is an employee

of WHC, the Court must then determine whether the indemnification clause in the Temporary Staffing Agreement between WHC and Progressive would nonetheless preclude a finding of GFIL's liability in this case.

**A.  Under D.C. law, Nurse Hand is an employee of WHC for purposes of the GFIL insurance policy.**

It is well-settled in D.C. that, "[u]nless it is obvious that the terms used in an insurance contract are intended to be used in a technical connotation, [the court] must construe them consistently with the meaning which common speech imports." *Travelers Indem. Co. of Ill. v. United Food & Commercial Workers Int'l Union*, 770 A.2d 978, 986 (D.C. 2001), quoting *In re Estate of Corriea*, 719 A.2d 1234, 1239 (D.C. 1998).  It is also settled that "[i]t is the duty of the insurer to spell out in plainest terms any exclusionary or delimiting policy provision.  Having failed to do so, the words employed must be given their common meaning and all ambiguities resolved against [the insurer]." *Nationwide Mut. Ins. Co. v. Schilansky*, 176 A.2d 786, 788 (D.C. 1961), quoting *Loffler v. Bos. Ins. Co.*, 120 A.2d 691, 693 (D.C. 1956).

The operative word in GFIL's insurance policy for purposes of this action is "employee." The policy does not clearly define the term, nor does it specify whether temporary employees, such as Nurse Hand, are included.  At first blush, it might seem that a temporary employee paid by a temp agency is not the "employee" of the business that retained the agency as that term is generally understood.  But available precedent indicates that the concept of who controls the individual is also part of the analysis, and therefore, it is more complex.  And to the extent the term is ambiguous, the lack of clarity operates to GFIL's detriment.

As a starting point, the common meaning can be gleaned from the dictionary.  *See* American Heritage Dictionary 604 (3d ed. 1992) (defining employee as any "person who works for another in return for financial or other compensation"); Webster's New World College

Dictionary (4th ed. 2002) (defining employee as "a person hired by another, or by a business firm, etc., to work for wages or salary"); Black's Law Dictionary 525 (6th ed. 1990) (defining employee as "a person in the service of another under any contract of hire, express or implied, oral or written, where the employer has the power or right to control and direct the employee in the material details of how the work is to be performed").   Indeed, the case chiefly relied upon by defendants, *Seattle Opera v. NLRB*, 292 F.3d 757 (D.C. Cir. 2002), reflects that the Supreme Court specifically consulted the American Heritage Dictionary and Black's Law Dictionary when defining the term "employee" for purposes of the National Labor Relations Act ("NLRA"). *Id.* at 762, citing *NLRB v. Town & Country Electric, Inc.*, 516 U.S. 85, 90 (1995).   And in that case, when the D.C. Circuit was faced with the need to define the word "employee" as used in section 152(3) of the NLRA, it concluded:

> [I]t is clear  that . . . the person asserting statutory employee status *does* have such status if (1) he works for a statutory employer in return for financial or other compensation . . . ; and (2) the statutory employer has the power or right to control and direct the person in the material details of how such work is to be performed.

*Id.*

The common meaning of the term can also be elucidated by reference to cases where it has been necessary to distinguish employees from non-employees in other contexts. Thus, plaintiff suggests that this Court should apply D.C.'s common law test for vicarious liability because differentiating between individuals who are employees and those who are independent contractors is essentially what is at issue here.   *See* Pl.'s Mem. in Supp. of Mot. for Partial Summ. J. ("Pl.'s Mem.") at 21–22.   Plaintiff also argues that it is appropriate to apply the vicarious liability test because other jurisdictions, such as Vermont and Michigan, have invoked common law tests to determine whether an individual is an employee for insurance purposes.

*See id.* at 22, citing *Progressive Mich. Ins. Co. v. Citizens Ins. Co of Am.*, No. 293167, 2010 WL 4483690, at *2 (Mich. Ct. App. 2010); *Hathaway v. Turner*, 2010 VT 114, 187 Vt. 126, 14 A.3d 968 (Vt. 2010), *RLI Ins. Co. v. Agency of Transp.*, 762 A.2d 475 (Vt. 2000), and *Crawford v. Lumbermen's Mut. Cas. Co.*, 220 A.2d 480 (Vt. 1966).  Defendants counter that the common law test is an inappropriate means for determining the common meaning of an ambiguous term in a contract.  Defs.' Mem. in Supp. of Mot. for Summ. J. ("Defs.' Mem.") at 11 [Dkt. # 33-1].  They direct the Court's attention to the *Seattle Opera* decision instead, and they assert that using its definition, Nurse Hand cannot be considered an employee because she did not receive compensation from WHC, and she did not have a contract with the hospital.  *Id.* at 17–18.  But defendants mischaracterize *Seattle Opera*. The application of the test articulated in that case would lead this Court to the same result obtained by reference to the vicarious liability test.

As the plaintiffs point out, the common law test is designed to get to the heart of the problem in this case – when an individual is an employee as opposed to an independent contractor.  The test makes sense in the insurance coverage context because it is designed to determine when an employer may be found liable for the torts of its employee, and the insurance policy was designed to cover the employer for exactly that potential liability.  And D.C.'s vicarious liability test takes into account many of the factors that can be drawn from consulting the dictionary definition.

On the other hand, in the *Seattle Opera* case, which defendants prefer, the question before the court was whether certain chorus members should be considered employees as opposed to a mere volunteers.  292 F.3d at 762.  As a result, the Circuit emphasized the existence of the economic relationship between the employer and the individuals seeking to exercise collective bargaining rights.  *Id.* at 762–64.  That factor alone does not resolve the ambiguity

11

here; indeed, the point in *Seattle Opera* was that they *were* paid, not who paid them.  Moreover, the existence of a contract was not itself determinative, and the court also looked quite closely at a factor defendants chose to ignore: the employer's right to control and direct the performance of the individuals involved.   *Id.* at 765.   More important, the Court of Appeals specifically referenced common law agency principles in its opinion.  *See Seattle Opera*, 292 F.3d at 765, n. 11 ("The dissent itself acknowledges, however, that the Board can and should consider the common law definition of "employee" when performing a section 152(3) analysis. . . . '[W]hen Congress has used the term 'employee' without [clearly] defining it, we have concluded that Congress intended to describe the conventional master-servant relationship as understood by common-law agency doctrine.'") (internal citation omitted).

For all of those reasons, then, in arriving at the common meaning of the term "employee," the Court finds it helpful to consider the factors set out in the vicarious liability test. Under D.C. law, the following factors are relevant in determining whether an employee/employer relationship exists: 1) the selection and engagement of the servant, 2) the payment of wages, 3) the power to discharge, 4) the power to control the servant's conduct, and 5) whether the work is part of the regular business of the employer.  *Schecter v. Merchs. Home Delivery, Inc.*, 892 A.2d 415, 423 (D.C. 2006), quoting *Beegle v. Rest. Mgmt. Inc.*, 679 A.2d 480, 485 (D.C. 1996).  Although "no single factor is controlling, 'the decisive test . . . is whether the employer has the right to control and direct the servant in the performance of his work and the manner in which the work is to be done."  *Id.*, quoting *Beegle*, 679 A.2d at 485 (emphasis omitted).

In this case, the third and fifth factors plainly support the conclusion that Nurse Hand was an employee of WHC on the day of her alleged negligence because, on that day, Nurse Hand

provided the "post-partum/post-operative care of Radianne Banks," Defs.' SMF ¶ 31 – work that is clearly part of the regular business of WHC – and WHC had the right to terminate Nurse Hand's employment at WHC whenever it felt that she was no longer capable of performing the tasks assigned. Eckert Dep. 52:4–7 (explaining that all WHC had to do to stop a nurse from working at WHC was "say this particular nurse is not meeting our standard . . . [and w]e will no longer choose to have them work at our hospital").

Factors 1 and 2, on the other hand, point slightly against a conclusion that, as a matter of law, there was an employee/employer relationship in this case. As to factor 1, the parties dispute how much of a role WHC played in the initial selection of nurses to fill its open shifts. *See* Pl.'s SMF ¶¶ 22–29; Defs.' SMF ¶¶ 24–27. If the Court were to find that factor 1 is material, this dispute could raise a question of fact, more appropriate for a jury to decide. Factor 2 also slightly weighs against an employee/employer relationship because WHC did not directly compensate the temporary nurses; instead, WHC paid Progressive who, in turn, paid the nurses. Ex. 2 to Pl.'s MSJ at 2, 7–8; *accord* Defs.' SMF ¶¶ 8–9, 13.

But any pull by factors 1 and 2 toward a finding that no employee/employer relationship exists become irrelevant in light of factor 4: the power to control the servant's conduct. As previously noted, D.C. courts view factor 4 as the most important factor in determining whether an employee/employer relationship exists. *Schecter*, 892 A.2d at 432; *Beegle*, 679 A.2d at 485; *Safeway Stores, Inc. v. Kelly*, 448 A.2d 856, 860 (D.C. 1982); *LeGrand v. Insur. Co. of N. Amer.*, 241 A.2d 734, 735 (D.C. 1968). Here, it is undisputed that WHC had the right to control Nurse Hand's conduct while she was working at WHC. Eckert Dep. 51:11–19; *see also* Pl.'s SMF ¶¶ 11–13; Ex. 2 to Pl.'s Mem at 5. Specifically, WHC "always retained the right in order to determine and ascertain what the assignment of the individual nurse would be," Eckert Dep. 51,

and dictated the day-to-day tasks of Progressive nurses at WHC by telling them what kind of medical care or attention to give a particular patient, *id.* at 56.  Consequently, factor 4 weighs strongly toward finding that Nurse Hand was an employee because WHC certainly controlled her conduct.[5]  This, along with the weight of factors 3 and 5, leads the Court to find that Nurse Hand and WHC had an employee/employer relationship.[6]

Consequently, applying the common meaning of the term employee as used in the particular context of a liability insurance policy, the Court concludes that Nurse Hand was an employee at the time of her alleged negligence and, therefore, was a covered "insured" under GFIL's policy.

**B. The indemnification clause does not preclude a finding that GFIL is liable.**

Defendants' alternative defense is that this Court should not find GFIL liable because to do so would lead to circular litigation that would ultimately result in plaintiff bearing the cost of

---

[5]     Defendants' argument that Progressive sent an in-house staff member to WHC to supervise Progressive nurses (a fact that plaintiff disputes) does not affect the Court's conclusion regarding factor 4 nor does it create a genuine issue of material fact that would preclude a grant of summary judgment.  As D.C. case law makes clear, the right to control in factor 4 means "the right to control an employee in the performance of a task and in its result, and not the actual exercise of control or supervision."  *Schechter*, 892 A.2d at 423.  WHC does not dispute that they had the right to control Progressive's nurses; instead, WHC acknowledges that, despite the alleged presence of a Progressive employee, WHC still maintained ultimate control over Progressive nurses' (and Nurse Hand's) day-to-day assignments and the medical plans they were to follow.  Eckert Dep. 51:11–19, 56.  Consequently, the presence of a Progressive employee at WHC is irrelevant in determining whether Nurse Hand was an employee of WHC.

[6]     If the Court accepted defendants' invitation to apply only the *Seattle Opera* test, it would again be required to focus on the element of control.  *See* 292 F.3d at 762.  The *Seattle Opera* test considers whether the "employer has the power or right to control and direct the person," and it also asks whether the individual "works for [the] employer in return for financial or other compensation."  *Id.*  Clearly, Nurse Hand performed her work for the employer in return for financial compensation.  And even if one concludes that what the Court of Appeals meant by "in return for" was whether the individual worked for the employer in return for financial compensation *provided by the employer*, that would leave the Court with one *Seattle Opera* factor favoring the plaintiff and one favoring the insurer, requiring the Court to resolve the tie against the insurer.

Nurse Hand's defense and liability.  Defs.' Mem. at 13–16.  This defense is premised on the indemnification clause included in the Temporary Staffing Agreement, which requires Progressive to indemnify WHC for any liability resulting from the actions of Progressive nurses. *Id.* at 13.  In other words, Defendants' argue that, should this Court find GFIL liable, GFIL, through subrogation, will file suit against Progressive for indemnification, and Progressive will then seek reimbursement from plaintiff Interstate, resulting in plaintiff being responsible for the money in the end.  *Id.*

Defendants' argument, however, overlooks one important detail:  the indemnification clause was waived by the broad language of the Settlement Agreement with Ms. Banks. Specifically, the Settlement Agreement provides that:

> WHC completely releases and forever discharges . . . Progressive and [Interstate] . . . from any and all claims . . ., which the WHC may now have or may hereafter have against . . . Progressive by reason of any matter, cause or thing arising out of, or in any manner connected with, the Litigation or the facts giving rise to the Litigation.
> *This release shall extend to every type of claim*, whether based on tort, *contract or other theory of recovery*, *including* but not limited to *the Temporary Staffing Agreement* . . . .

Ex. 12 to Pl.'s Mem at 3 (emphasis added).  Because the indemnification clause was in the Temporary Staffing Agreement and the provision quoted above waived any claim or "other theory of recovering including but not limited to the Temporary Staffing agreement," WHC effectively waived its right to indemnification.  *Id.*  Consequently, a finding that GFIL is liable will not lead to circular litigation because GFIL will not be able to step into WHC's shoes to sue for indemnification.

Instead, the "other insurance" provisions found within both plaintiff's and GFIL's insurance policies control the allocation of liability for Nurse Hand's settlement and defense.

*See Jones v. Medox, Inc.*, 430 A.2d 488, 493–94 (D.C. 1981) (refusing to adopt the *Lamb-Weston* rule of dividing liability equally among insurers and instead allowing the language of the "other insurance" provisions to control where the provisions are reconcilable); *see also Keene Corp. v. Ins. Co. of N. Am.*, 667 F.2d 1034, 1050 n.37 (D.C. Cir. 1981) (noting that insurers may be required to share defense costs based on how liability is distributed by their "other insurance" provisions).

Here, defendants do not dispute that GFIL's "other insurance" provision establishes that its policy provides primary insurance coverage to WHC employees. Defs.' SMF ¶ 40. They also do not dispute that plaintiff's "other insurance" provision transforms plaintiff's policy into excess coverage when "there is other valid insurance (whether primary, excess, contingent or self-insurance) which may apply against a loss or claim covered" by that policy. *Id.* ¶ 45. Instead, defendants simply argue that Nurse Hand was not an employee of WHC, and therefore not covered by GFIL's policy, and, alternatively, that the indemnification clause should prevent the Court from applying the "other insurance" provisions and thus finding GFIL liable. As the Court has already rejected both of defendants' arguments, it follows that the Court, in applying the D.C. courts' practice of looking at "other insurance" provisions to allocate liability, will grant plaintiff's motion for partial summary judgment with regard to GFIL's liability.

## II.    WHC and MedStar are not liable under any of plaintiff's causes of action.

In its complaint, plaintiff asserts the theories of subrogation, breach of contract, and contribution against all defendants, including WHC and MedStar. Compl. ¶¶ 31–40. Defendants, however, argue that WHC and MedStar are not liable under any of those theories. It is worth noting that plaintiff essentially concedes this issue, as it does not respond to defendants' arguments or object to defendants' conclusions that plaintiff has no legal claim against WHC or

MedStar.  But, regardless of whether this issue is conceded, the Court finds defendants' arguments persuasive.

First, pursuant to the Settlement Agreement, Nurse Hand and Progressive released WHC and MedStar from any liability connected with the underlying litigation.  Ex. 12 to Pl.'s MSJ at 3–4; *see also* Defs.' Mem. at 6–7.  Therefore, plaintiff may not use subrogation in order to recover against WHC and MedStar.  Second, WHC and MedStar are also not liable under a theory of breach of contract.  Neither company has entered into a contract with plaintiff, Defs.' Mem. 7, 9, and plaintiff's breach of contract claim is based solely on the alleged insurance relationship between GFIL and Nurse Hand, Compl. ¶¶ 31–36.  Finally, WHC and MedStar are not liable under a theory of contribution.  Plaintiff's sole theory of contribution, or reallocation of the settlement, is that the "other insurance" provisions in its own insurance policy and in GFIL's insurance policy indicate that GFIL provided primary insurance for Nurse Hand, making its policy "excess insurance."  Pl.'s Mem. at 12–19, 31–38; Defs.' Mem. 8–9.  Neither WHC nor MedStar is an insurer and, therefore, they cannot be liable under the theory of contribution.

Based on the above mentioned facts and plaintiff's concession that WHC and MedStar are not liable under any of the above theories, this Court will grant defendants' summary judgment motion in part, insofar as it relates to the liability of WHC and MedStar.

**CONCLUSION**

Because the Court finds that Nurse Hand was an "employee" under the GFIL insurance policy and that the "other insurance" provisions of the GFIL and Interstate insurance policies control in this case, the Court will grant plaintiff's partial motion for summary judgment [Dkt. # 32] and deny defendants' cross-motion [Dkt. # 33] as it pertains to defendant GFIL.  But, based on its finding that defendants WHC and MedStar are not liable under any theory advanced by plaintiff, the Court will grant defendants' cross-motion as it pertains to WHC and MedStar.

AMY BERMAN JACKSON
United States District Judge

DATE:  March 28, 2012